1

2

3

4

5

6

7

8            **UNITED STATES DISTRICT COURT**

9            **EASTERN DISTRICT OF CALIFORNIA**

10

11   CURTIS RENEE JACKSON,              )   Case No.: 1:14-cv-00222-LJO-SAB (PC)
                                        )
12               Plaintiff,             )
                                        )   **FINDINGS AND RECOMMENDATIONS**
13        v.                            )   **RECOMMENDING DEFENDANTS' MOTION**
                                        )   **FOR SUMMARY JUDGMENT BE GRANTED**
14   DYE, et al.,                       )
                                        )   [ECF Nos. 27 & 39]
15               Defendants.            )
                                        )
16   _____      )

17          Plaintiff Curtis Renee Jackson is appearing pro se and in forma pauperis in this civil rights

18   action pursuant to 42 U.S.C. § 1983.  Pursuant to 28 U.S.C. § 636(c), Plaintiff consented to the

19   jurisdiction of the United States Magistrate Judge on March 3, 2014.  Defendants have not consented

20   to United States magistrate judge jurisdiction; therefore, this matter was referred to the undersigned

21   pursuant to 28 U.S.C. § 636(1)(B) and Local Rule 302.

22                                            **I.**

23                                    **RELEVANT HISTORY**

24          This action is proceeding against Defendants Dye and Mills for deliberate indifference to a

25   serious medical need by failing to treat Plaintiff's urinary tract infection for three days.

26          Defendants filed an answer to the second amended complaint on February 12, 2015.  (ECF No.

27   20.)  On February 13, 2015, the Court issued the discovery and scheduling order.  (ECF No. 21.)

28

                                               1

After receiving an extension of time, Defendants filed a motion for summary judgment on January 25, 2016.  After receiving two extensions of time, Plaintiff filed an opposition on April 27, 2016, and Defendants filed a reply on May 4, 2016.

On May 23, 2016, Plaintiff filed "objections" to Defendants' reply, i.e. sur-reply.

On May 27, 2016, Defendants filed a motion to strike Plaintiff's authorized sur-reply.

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendant does not bear the burden of proof at trial and in moving for summary judgment, he need only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If Defendant meets his initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial."  In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323).  This requires Plaintiff to "show more than the mere existence of a scintilla of evidence."  Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

However, in judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d

978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).  The Court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a pro se prisoner.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

**III.**

**DISCUSSION**

**A.      Motion to Strike Surreply**

On May 27, 2016, Defendants filed a motion to strike Plaintiff's filing of an unauthorized sur-reply.  (ECF No. 39.)

Parties do not have the right to file surreplies and motions are deemed submitted when the time to reply has expired.  Local Rule 230(*l*).  The Court generally views motions for leave to file a surreply with disfavor.  Hill v. England, No. CVF05869 REC TAG, 2005 WL 3031136, at *1 (E.D. Cal. 2005) (citing Fedrick v. Mercedes-Benz USA, LLC, 366 F.Supp.2d 1190, 1197 (N.D. Ga. 2005)).  However, district courts have the discretion to either permit or preclude a surreply.  See U.S. ex rel. Meyer v. Horizon Health Corp., 565 F.3d 1195, 1203 (9th Cir. 2009) (district court did not abuse discretion in refusing to permit "inequitable surreply"); JG v. Douglas County School Dist., 552 F.3d 786, 803 n.14 (9th Cir. 2008) (district court did not abuse discretion in denying leave to file surreply where it did not consider new evidence in reply); Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996) (new evidence in reply may not be considered without giving the non-movant an opportunity to respond).

Although Plaintiff does not have a right to file a surreply, in this instance the Court will exercise its discretion and consider the sur-reply in ruling on Defendants' motion for summary judgment.  Accordingly, Defendants' motion to strike the filing of the surreply should be denied.

///

///

3

**B.      Defendants' Objections to Plaintiff's Declaration and Exhibits**

On May 4, 2016, Defendants filed objections to Plaintiff's declaration and attached exhibits submitted in opposition to their motion for summary judgment and move to strike such evidence.

It is not practice of this Court to rule on each evidentiary objection, individually, and the Court will rule on the objections in the analysis portion of the instant findings and recommendations as pertinent to the arguments.

**C.      Allegations Set Forth in Second Amended Complaint**

On May 18, 2013, at approximately 9:00 a.m. Plaintiff sought medical treatment at the Facility C Clinic due to extreme stomach pain.  Plaintiff immediately approached LVN L. Mills and explained in detail the medical conditions he was experiencing.  Mills insisted Plaintiff fill out and complete the health care service request form-CDC 7362.  Mills conferred with RN, Dye who informed Mills that Plaintiff must complete the required health care service request form.  Mills informed Plaintiff, he would be called in a couple days.

On May 18, 2013, at approximately 10:00 a.m., Plaintiff returned to the Facility C Clinic and observed RN Dye standing in the door way of the clinic.  Plaintiff informed Dye that he was now urinating blood and he was in pain.  Dye instructed Plaintiff to complete and submit the health care service request form.

During each day, Plaintiff urinated approximately three to four times a day and was in excruciating pain.

On May 21, 2013, at approximately 8:00 a.m. Plaintiff was finally seen by RN Arola at the Facility C Clinic.  Arola performed a urinalysis test that revealed a urinary tract infection.  Plaintiff was taken to the prison's main hospital for further testing and treatment.  Upon his arrival, Plaintiff was given various different types of medication.

**D.      Statement of Undisputed Facts**

1.      At all times relevant to this suit, Plaintiff Curtis Renee Jackson (J-88116) was an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR), incarcerated at Pleasant Valley State Prison (PVSP).  (Decl. of V. Whitney (Whitney Decl.), Ex. I [Jackson Dep.] at 12:14-16.)

2.       Jackson is not a medical doctor and has had no medical training.  (Jackson Dep. 7:24-8:4.)

3.       On May 18, 2013, Inmate Jackson submitted a Health Care Services Request (CDCR 7362)—which inadvertently has the 17th listed as the date of submission.  (Jackson Dep. at 25:12-19, 28:8-12, and Ex. 4; Decl. of B. Barnett, M.D. (Barnett Decl.) ¶ 5, Ex. B.)

4.       Jackson identified the reason he was requesting health care services in the 7362 as "can't retain urine" and also another word that looks like "vomiting" or "voiding." (Barnett Decl. ¶ 5.)

5.       Jackson confirms that his CDCR 7362 identified his complaint as "can't retain urine and vomiting."  (Jackson Dep. at 25:20-26:5 and Ex. ¶ 4.)

6.       Jackson's 7362 submitted on May 18, 2013, does not indicate he was having excruciating pain.[1]  (Jackson Dep. at 26:7-14 and Ex. 4; Barnett Decl. ¶ 21, Ex. B.)

7.       Jackson's 7362 submitted on May 18, 2013, does not indicate he had blood in his urine. (Jackson Dep. Ex. 4.)

8.       While Jackson claims to have submitted a second 7362 at 10:00 a.m. on May 18, 2013, he does not have such a form, has not seen such a form, has no idea what happened to it, and there is no record of a second CDCR 7362 in Jackson's medical records. (Jackson Dep. at 26:18-27:6; Barnett Decl. ¶ 9.)

9.       The only CDCR 7362 in Jackson's Unit Health Record is the one submitted by Jackson at 9:00 a.m. on May 18, 2013.  (Jackson Dep. at 28:23-29:7 and Ex. 4; Barnett Decl. ¶¶ 5, 9.)

---

[1] Plaintiff attempts to dispute this fact by stating he alleged he "cant' retain urine, and vomiting is a significant indication of abdominal trauma, and pain."  (Resp. to Stmt. of Facts, at 2:15-18, ECF No. 34.)  However, the CDCR 7362 form itself is the best evidence of what is indicated on it as opposed to the undocumented inferences Plaintiff presents.  Fed. R. Evid. 1001, 1002.  In addition, to support his argument, Plaintiff cites to various treatment notes from May 21, 2013, not May 18, 2013.  Accordingly, this fact is undisputed.

10.   Mr. Jackson's CDCR 7362 submitted at or about 9:00 a.m. on May 18, 2013, was triaged by Registered Nurse (RN) Rojas at noon on Sunday, May 19, 2013.  (Barnett Decl. ¶ 10; Jackson Dep. at 28:8-29:17.)

11.   Inmates are instructed to make their request for medical attention known by writing on a form 7362.  Pursuant to current protocols, each form 7362 should be reviewed by an RN within one day following the inmate's submission of the form.  (Barnett Decl. ¶ 10, n. 2.)

12.   The review of the CDCR 7362 by RN Rojas on May 19, 2013, was done within the timeframe required by the rules established in Plata v. Schwarzenegger.  (Barnett Decl. ¶ 10.)

13.   After RN Rojas' triage of Jackson's 7362 on May 19, 2013, Jackson was seen by RN Arola at about 8:00 a.m. on May 21, 2013.  (Jackson Dep. at 31:8-12, 37:9-13 and Ex. 2; Barnett Decl. ¶ 12.)

14.   RN Arola noted Jackson's chief complaint on May 21, 2013, as pain, nausea, and can't empty bladder.  (Jackson Dep. at 37:16-19 and Ex. 2; Barnett Decl. ¶ 2.)

15.   RN Arola conducted a urine dipstick test which was positive for signs and symptoms consistent with a urinary tract infection (UTI), and she sent Jackson to the Triage and Treatment Area (TTA) at 8:40 a.m.  (Barnett Decl. ¶ 12, Ex. E; Jackson Dep. at 38:7-21 and Ex. 2.)

16.   Mr. Jackson was seen at the TTA at 11:40 a.m. on May 21, 2013.  (Barnett Decl. ¶ 13, Ex. F.)

17.   The TTA Services Flow Sheet in Mr. Jackson's medical records indicates he was seen by RN Keirn, and by Physician Assistant (PA) Wilson.  (Barnett Decl. ¶ 13, Ex. F.)

18.   On the TTA Flow Sheet, RN Keirn notes Jackson's chief complaint was "painful urination since 5/17/13." RN Keirn records the evaluations done, treatment given, vitals taken, tests done (urinalysis), and medication given.  RN Keirn notes Mr. Jackson was discharged from the TTA at 1335 hours.  (Barnett Decl. ¶ 14, Ex. F.)

19.   PA Wilson notes that the chief complaint was painful urination.  (Jackson Dep. at 38:22-24 and Ex. 2; Barnett Decl. ¶ 15, Ex. G.)

20.   PA Wilson also notes that Jackson had a complaint of low abdominal pain, fever, chills, urinary urgency-frequency, hematuria and dysuria for one day.[2]  (Barnett Decl. ¶ 15, Ex. G; Jackson Dep., Ex. 2.)

21.   Jackson did not tell PA Wilson that he was having nausea and vomiting.  (Jackson Dep. at 39:25-40:6 and Ex. 2.)

22.   Jackson did not tell PA Wilson or RN Arola on May 21, 2013, that he was not eating or drinking anything, and has no reason for that omission.

23.   Jackson did not tell PA Wilson at the TTA on May 21, 2013, that he had been nauseated or had been vomiting, and has no reason for that omission.[3]

24.   On May 21, 2013, PA Wilson provided Jackson with IV fluids, antibiotics, labs, a lay in for one day, and ordered Jackson to return in 1-3 days.  (Barnett Decl. ¶ 15, Ex. G; Jackson Dep. at 41:12-14.)

25.   Jackson was discharged from the TTA at 1334 hours on May 21, 2013.  (Barnett Decl. ¶ 14, Ex. F.)

26.   Jackson was seen for his follow up by Dr. Ho on May 24, 2013, at 1:34 p.m., at which time he stated he felt better, abdominal pain had resolved, no fever, and no urinary frequency.  (Jackson Dep. at 42:2-20 and Ex. 6; Barnett Decl. ¶ 16, Ex. H.)

27.   Jackson's report to Dr. Ho on May 24, 2013, is consistent with acute UTI having resolved.  (Barnett Decl. ¶ 16.)

---

[2] Plaintiff states this fact is admitted in part and denied in part.  Plaintiff alleges on CDCR 7362 misdated for May 17, 2013, instead of May 18, 2013, "can[']t retain urine, and vomiting" was the first stages of the manifestation of Plaintiff's UTI.  Plaintiff cites to his deposition and his declaration in support of his argument.  However, this fact is undisputed as the best evidence of what PA Wilson notes on May 21, 2013, is the actual treatment notes by PA Wilson.  Fed. R. Evid. 1001, 1002.  In addition, Plaintiff is not qualified to provide his own lay opinion relating to his medical condition.

[3] Plaintiff attempts to dispute this fact by denying that PA Wilson was not aware of Plaintiff's nausea and vomiting.  Plaintiff alleges that RN Arola's chief complaint dated May 21, 2013, faxed to TTA revealed nausea and vomiting.  However, this fact concerns what Plaintiff told PA Wilson on May 21, 2013, and Plaintiff's deposition testimony reveals that he did not inform PA Wilson that he was nauseated or vomiting.  (Jackson Dep. at 41:4-10.)

28.  At all times relevant to this suit, Defendant Mills was a Licensed Vocational Nurse (LVN) at PVSP.  (Defs' Answer to Second Am. Compl. [ECF No. 20] ¶ 3.)

29.  Defendant Mills was and is licensed by the California Board of Vocational Nursing from October 2005 to the present.  (Decl. of V. Whitney, Ex. J (Mills' Resp. to Interrog. (Set One)), Resp. to Interrog. No. 6.)

30.  At 9:00 a.m., on May 18, 2013, LVN Mills issued to inmate Jackson his weekly medical supplies at the window of the C Facility Clinic at PVSP, and inmate Jackson signed for them.  (Whitney Decl. ¶ 6, Ex. M [Bates No. MILLS 0034]; Jackson Dep. at 19:15-20 and Ex. 3; Barnett Decl. ¶ 6, Ex. C.)

31.  While Jackson complaints that LVN Mills instructing him to complete a CDCR 7362 was an act of deliberate indifference, asking Jackson to complete a CDCR 7362 would be proper procedure, reasonable, and helpful to assist in making a determination as to who his complaint should be triaged, as compared to other inmates seeking medical care.  Obtaining information from Jackson in writing, by way of a CDCR 7362, is a responsible, not indifferent act.  (Barnett Decl. ¶ 18.)

32.  Although Jackson also complaints that LVN Mills was deliberately indifferent because she did not report RN Dye for not emergently treating his complaint that he "can't retain urine," and possibly about "vomiting," as an LVN, Defendant Mills may not make a medical or nursing diagnoses and may not assume responsibility for determining nursing interventions for patients.  (Mills' Resp. to Interrog. No. 4; Barnett Decl. ¶ 20.)

33.  As an LVN, it would not have been within Mills' scope of practice to perform a comprehensive assessment, and she is prohibited from the part of the triage process that includes independent evaluation, interpretation of data, and determination of treatment priorities and levels of care.  (Mills' Resp. to Interrog. No. 4; Barnett Decl. ¶ 20.)

34.  Defendant Mills, as an LVN, is not qualified or authorized to instruct a medical doctor or RN as to whether or when an inmate-patient requires medical services.  (Barnett Decl. ¶ 20.)

35.   Defendant Mills, as an LVN is not qualified or authorized to tell a medical doctor or RN to examine any inmate-patient.  (Mills' Resp. to Interrog. No. 5; Barnett Decl. ¶ 20.)

36.   Pursuant to Health Care Services LVN Scope of Practice Standards, LVNs are not independent practitioners and must practice under the direction of a licensed physician or Registered Nurse at all times.  (Whitney Decl. ¶ 6, Ex. L. [Bates No. MILLS 0002]; Barnett Decl. ¶ 20.)

37.   Pursuant to Health Care Services LVN Scope of Practices Standards, LVNs may not perform a comprehensive assessment of an inmate-patient, which means LVNs cannot take a complete medical history or do a complete medical examination.  (Whitney Decl. ¶ 6, Ex. L [Bates No. MILLS 0003]; Barnett Decl. ¶ 20.)

38.   Pursuant to Health Care Services LVN Scope of Practice Standards, LVNs may not perform the part of the triage process that includes independent evaluation, interpretation of data, and determination of treatment priorities and levels of care.  (Whitney Decl. ¶ 6, Ex. L [Bates No. MILLS 003]; Barnett Decl. ¶ 20.)

39.   Pursuant to Health Care Services LVN Scope of Practice Standards, LVNs may not make a medical or nursing diagnosis.  (Whitney Decl. ¶ 6, Ex. L [Bates No. MILLS 0003]; Barnett Decl. ¶ 20.)

40.   Pursuant to Health Care Services LVN Scope of Practice Standards, LVNs may not assume responsibility for determining nursing interventions for specific patients.  (Whitney Decl. ¶ 6, Ex. L [Bates No. MILLS 0003]; Barnett Decl. ¶ 20.)

41.   Pursuant to Health Care Services LVN Scope of Practice Standards, LVNs may not independently determine or initiate a course of action.  (Whitney Decl. ¶ 6, Ex. L [Bates No. MILLS 0004]; Barnett Decl. ¶ 20.)

42.   Pursuant to Health Care Services LVN Scope of Practice Standards, LVNs may not assume total responsibility for determining the effectiveness of the nursing care provided.  (Whitney Decl. ¶ 6, Ex. L [Bates No. MILLS 0004]; Barnett Decl. ¶ 20.)

43.   Pursuant to Health Care Services LVN Scope of Practice Standards, while LVNs may receive and record verbal orders from physicians to administer medications and/or treatment, they may not dispense medications, which includes that they may not interpret a physician's order for a drug, the proper selection, measuring, packaging, labeling, or in any way filling a prescription, may not count medications, place them in a container, or issue them to an inmate-patient.  (Whitney Decl. ¶ 6, Ex. L [Bates No. MILLS 0006].)

44.   Jackson acknowledges that it was not up to LVN Mills to make a diagnosis.  (Jackson Dep. at 42:3-5, 44:8-10.)

45.   Jackson did not see or speak with LVN Mills when he allegedly went back to the C Facility Clinic at 10:00 a.m. on May 18, 2013.  (Jackson Dep. at 32:17-23.)

46.   Between May 18, 2013, and May 21, 2013, Inmate Jackson did not see LVN Mills. (Jackson Dep. at 32:7-10.)

47.   Jackson had no interaction with LVN Mills after May 18, 2013.  (Jackson Dep. at 44:22-24.)

48.   Jackson had interacted with LVN Mills before May 18, 2013, and his interactions with her were normal and she was always professional.  (Jackson Dep. at 44:13-18.)

49.   In Jackson's interactions with LVN Mills she had never said anything to him to make him think that she did not care about his medical health.  (Jackson Dep. at 44:19-21.)

50.   When asked if there was anything that Jackson believed indicated LVN Mills wanted him to suffer harm, Jackson responded that he had no idea.  (Jackson Dep. at 46:13-15.)

51.   When asked if there was anything that Jackson believed indicated LVN Mills wanted him to suffer harm, Jackson responded that he had no idea.  (Jackson Dep. at 46:13-15.)

52.   At all times relevant to this suit, Defendant Dye was a Registered Nurse (RN) at PVSP. (Defs' Answer to Second Am. Compl. [ECF No. 20] ¶ 3.)

53.   Defendant Dye became licensed as a Registered Nurse in North Carolina in 2003, and in California in 2006, and is still licensed by the Boards of Registered Nurses in both

1   states.  (Whitney Decl. Ex. J (Dye's Resp. to Interrog. (Set One)), Resp. to Interrog.

2   No. 7.)

3   54.   In general, as a Registered Nurse, Defendant Dye is required to perform her duties as a

4        Registered Nurse according to the scope of practice as stated in Business & Professions

5        Code sections 2725 and 2725(d)(2), and to comply with procedures developed

6        according to the California Board of Registered Nurses.  (Dye's Resp. to Interrog. No.

7        1.)

8   55.   As a Registered Nurse at the C Facility Clinic at PVSP, Defendant Dye was required to

9        perform her duties as an RN as set forth in her duty statement; PVSP Operations

10       Procedure Number 110, Medical Emergency Response Documentation and Review;

11       PVSP Operations Procedure Number 113, Primary Care Model; California Correctional

12       Health Care Services Inmate Medical Services Policy and Procedures (IMSP&P),

13       Nursing Program Overview; IMSP&P, Chapter 2, Introduction to Nursing Protocols;

14       IMSP&P, Chapter 4, Access to Primary Care; IMSP&P, Volume 4: Medical Services,

15       IMSP&P, Chapter 12: Emergency Medical Response, 4.12.1 Emergency Medical

16       Response System Policy, IMSP&P, Volume 4: Medical Services; and Chapter 12:

17       Emergency Medical Response, 4.12.2 Emergency Medical Response System

18       Procedure.  (Dye Resp. to Interrog. Nos. 1, 8.)

19  56.   Jackson did not speak with RN Dye when he went to the C Facility Clinic at 9:00 a.m.

20       on May 18, 2013.  (Jackson Dep. at 32:11-13.)

21  57.   Jackson did not even see RN Dye when he went to the C Facility Clinic at 9:00 a.m. on

22       May 18, 2013.  (Jackson Dep. at 32:14-16.)

23  58.   On May 18, 2013, when Jackson claims to have handed a CDCR 7362 to LVN Mills,

24       and he alleges LVN Mills went to speak to RN Jackson, he did not see LVN Mills go

25       and talk to RN Dye.  (Jackson Dep. at 17:11-15.)

26  59.   On May 18, 2013, when Jackson claims to have handed a CDCR 7362 to LVN Mills,

27       and he alleges LVN Mills went to speak to RN Jackson, he has no idea whether LVN

28       Mills took the CDCR 7362 to RN Dye.  (Jackson Dep. at 17:19-20.)

60. On May 18, 2013, when Jackson claims to have handed a CDCR 7362 form to LVN Mills at 9:00 a.m., and he alleges LVN Mills went to speak to RN Jackson, he did not hear any conversation between LVN Mills and RN Jackson [sic].  (Jackson Dep. at 33:20-25.)

61. Policy requires the completion of a CDCR Form 7362 (Health Care Service Request) in all cases, which must be completed by the inmate-patient, or if unable, by health care staff, identifying the complaint(s) for which he is requesting to be seen.  (Dye Resp. to Interrog. No. 6.)

62. Had Jackson presented to the C Facility Clinic reporting blood in his urine, Jackson would have been required to complete a CDCR 7362 to provide information necessary to assist in making a determination as to how his complaint should be triaged as compared to other inmate-patients seeking medical care.  (Dye Resp. to Interrog. No. 4; Barnett Decl. ¶ 18.)

63. Even assuming RN Dye asked Jackson to complete a CDCR 7362, obtaining information in writing, by way of a CDCR 7362, is a responsible, not indifferent act. (Barnett Decl. ¶ 18.)

64. The CDCR 7362 Jackson submitted on May 18, 2013, was reviewed and triaged by RN Rojas on May 19, 2013, not by RN Dye.  (Jackson Dep. at 29:8-17; Barnett Decl. ¶ 10 and Ex. B.)

65. The review of Jackson's CDCR 7362 by RN Rojas was done within the timeframe required by the rules established in Plata v. Schwarzenegger.  (Barnett Decl. ¶ 10 and Ex. B.)

66. An inmate simply reporting that he had blood in his urine does not necessarily constitute an emergency.  (Dye Resp. to Interrog. No. 4.)

67. An inmate simply reporting that he had blood in his urine does not necessarily constitute an emergency.  (Dye Resp. to Interrog. No. 4.)

68. Jackson has no idea how many patients were treated by RN Dye on May 18, 2013. (Jackson Dep. at 30:24-31:2.)

69. Jackson has no idea of the seriousness of the conditions of any of the patients treated by RN Dye on May 18, 2013.  (Jackson Dep. at 31:3-7.)

70. Before May 18, 2013, Jackson had quite a few interactions with RN Dye, which he describes as "seemed like she was concerned."  (Jackson Dep. at 44:25-45:11.)

71. Jackson acknowledges that in his interactions with RN Dye, she was concerned about him, took care of him, and made sure he had what he needed.  (Jackson Dep. at 45:12-14.)

72. The reason Jackson believes RN Dye did not care about him on May 18, 2013, was that she sent him through the formalities of filling out a CDCR 7362.  (Jackson Dep. at 46:1-9.)

73. RN Dye did not say anything cruel to Jackson or anything to make him think that she wanted him to suffer on May 18, 2013.  (Jackson Dep. at 46:3-7.)

74. After visiting the C Facility Clinic on May 18, 2013, Jackson went back to his cell, and did not inform any correctional officer in between then and May 21, 2013, that he had a medical emergency for which he needed help.  (Jackson Dep. at 34:17-24.)

75. On May 20, 2013, Jackson attended a scheduled weekly physical therapy appointment and had physical therapy at noon.  (Jackson Dep. at 34:25-35:18 and Ex. 5; Barnett Decl. ¶ 11, Ex. D.)

76. At Jackson's physical therapy on May 20, 2013, he never mentioned to the physical therapist that he was having any stomach pain, could not urinate, was vomiting, or wasn't feeling well.  (Jackson Dep. at 36:3-16 and Ex. 5.)

77. The physical therapist does not record any complaint by Jackson or stomach pain, inability to urinate, vomiting, or illness.  (Jackson Dep. Ex. 5.)

78. There is no report in the physical therapist's note that Jackson was distressed in any part of his body or had any complaints on May 20, 2013.  (Barnett Decl. ¶ 11, Ex. D.)

79. No doctor has told Jackson that he suffered any kind of permanent injury or damage as a result of his not receiving medical treatment for his UTI between May 18 and May 21, 2013.  (Jackson Dep. at 48:1-4.)

### E.      Deliberate Indifference to Serious Medical Need

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 847 (1994) and Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).  While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain.  Morgan, 465 F.3d at 1045 (citing Rhodes, 452 U.S. at 347).

Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety, Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted), but not every injury that a prisoner sustains while in prison represents a constitutional violation, Morgan, 465 F.3d at 1045 (quotation marks omitted).  To maintain an Eighth Amendment claim, inmates must show deliberate indifference to a substantial risk of harm to their health or safety.  See, e.g., Farmer, 511 U.S. at 847; Thomas v. Ponder, 611 F.3d 1144, 1151-52 (9th Cir. 2010); Foster v. Runnels, 554 F.3d 807, 812-14 (9th Cir. 2009); Morgan, 465 F.3d at 1045; Johnson, 217 F.3d at 731; Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

For claims arising out of medical care in prison, Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent."  Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006)).  Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).  The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care.  Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012) (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.

### F.      Findings on Motion

Defendants Mills and Dye move for summary judgment "because directing [Plaintiff] to prepare basic paperwork as procedure required was not a deliberately indifferent act but rather, an

14

administrative necessity for the non-party appointment scheduler to triage his condition in relation to other inmates seeking medical care.  Further, [Plaintiff] concedes that he has no evidence that either deliberately disregarded any risk of which they were aware.  Moreover, [Plaintiff] concedes he suffered no further harm from the three-day delay."  (Mot. at 1:11-16; ECF No. 27.)

In opposition, Plaintiff argues that Defendants Mills and Dye denied him medical treatment by requiring Plaintiff to fill out a CDCR 7362 form and wait three days before treatment.

In response, Defendants argue that Plaintiff has failed to demonstrate a genuine issue of material fact showing a culpable state of mind on the part of either Defendant to demonstrate deliberate indifference.

1.   Defendant LVN Mills

The factual basis of Plaintiff's complaint against LVN Mills consists of instructing him to fill out a CDCR 7362 form in response to his complaint of inability to retain urine and failing to report RN Dye for not immediately treating his complaint.

It is undisputed that on May 18, 2013, at approximately 9:00 a.m., Plaintiff submitted a CDCR 7362 form requesting medical attention for retaining urine and "vomiting."  Pursuant to CDCR protocol, each CDCR 7362 should be reviewed by an RN within one day following the submission. (UF 11[4]; Barnett Decl. ¶ 10, n. 2.[5])  Plaintiff's May 18, 2013, CDCR 7362 was reviewed by RN Rojas on May 19, 2013-within the time frame established in <u>Plata v. Schwarzenegger</u>.  (UF 12; Barnett Decl. ¶ 10.)  Inmates with non-emergent health care needs are seen by an RN on the following business day for face-to-face triage.  (Barnett Decl. ¶ 10, n.2.)  After RN Rojas' triage of Plaintiff's 7362 on May 19, 2013, Plaintiff was seen by RN Arola on May 21, 2013, at approximately 8:00 a.m.  (UF 13; Jackson Dep. at 31:8-12, 37:9-13 and Ex. 2; Barnett Decl. ¶ 12.)

---

[4] "UF" refers the Statement of Undisputed Facts set forth above in section D.

[5] Dr. B. Barnett, is the Chief Medical Consultant at California Correctional Health Care services ("CCHS") for the Receiver's Office of Legal Affairs.  (Barnett Decl. ¶ 1.)  As Chief Medical Consultant at CCHS, Dr. Barnett's job duties include reviewing medical records to monitor the quality of healthcare provided to California inmates, instructing nurses and physicians regarding standards of care, and providing direct medical care to inmates.  (<u>Id.</u> at ¶ 3.)  Dr. Barnett's expertise includes treatment of conditions, common and rare, that manifest in the prison population, including the management of abdominal pain and urinary tract diseases.  (<u>Id.</u>)

It is undisputed that Mills, as a LVN, is not qualified or authorized to instruct a medical doctor or RN as to whether or whom an inmate-patient requires medical attention, or instruct them to examine any inmate-patient.  (UF 35, 36; Mills' Resp. to Interrog. No. 5; Barnett Decl. ¶ 20.)  LVNs are not independent practitioners and must practice under the direction of a licensed physician or RN at all times.  (UF 37; Whitney Decl. ¶ 6, Ex. L [Bates No. MILLS 0002]; Barnett Decl. ¶ 20.)  Indeed, the Scope of Practice Standards restricts LVNs, such as Mills, from performing a comprehensive assessment of an inmate-patient, performing the part of the triage process that includes independent evaluation, interpretation of data, and determination of treatment priorities and levels of care.  (UF 38, 39; Whitney Decl. ¶ 6, Ex. L [Bates No. MILLS 003]; Barnett Decl. ¶ 20.)  In addition, LVN Mills may not make a medical or nursing diagnosis, is precluded from assuming responsibility for determining nursing interventions, may not independently determine or initiate a course of action, and may not assume total responsibility for determining the effectiveness of the nursing care provided. (UF 40, 41, 42, 43.)

In this instance, LVN Mills met her duty by obtaining information from Plaintiff to communicate to the assigned RN by way of the CDCR 7362.  Pursuant to policy, completion of a CDCR 7362 is required in all cases to identify the complaint(s) for which the inmate-patient is requesting examination.  (UF 62.)  Submission of the CDCR 7362 assists in making a proper determination as to how an inmate's complaint should be triaged as compared to other inmate-patients seeking medical attention.  (UF 32, 63.)  Therefore, LVN Mills direction for Plaintiff to complete a CDCR 7362 not only complied with proper procedure, it was also reasonable and helpful to assist in making the proper determination as to how Plaintiff's complaint should be triaged, as compared to other inmates seeking medical attention.  (UF 32.)  Contrary to Plaintiff's contention, Defendant Mills responded to Plaintiff's serious medical need by forwarding his paperwork to the necessary RN for assessment, and Plaintiff was seen by RN Rojas the following day on May 19, 2013.

With regard to Plaintiff's second claim, that LVN Mills failed to report RN Dye for not immediately treating Plaintiff at 9:00 a.m. on May 18, 2013, it also fails on the merits.  As previously stated, it was not within LVN Mills' scope of duties or authority to perform the part of the triage process that includes independent evaluation, interpretation of data, and determination of treatment

priorities and levels of care, to independently determine or initiate a course of action with any inmate-patient, to make a medical diagnosis, to assume responsibility for determining nursing interventions, to assume total responsibility for determining the effectiveness of nursing care provided, or to determine the necessity for or the propriety of nursing assessment or care delivered to Plaintiff.  (UF 38, 39, 40, 41, 42, 43.)  Indeed, Plaintiff concedes that it was not up to LVN Mills to make a diagnosis.  (UF 45.) There is no indication or allegation that LVN Mills interfered with Plaintiff's submission of his CDCR 7362 request for health services, or that Mills was responsible for Plaintiff not receiving any response for a couple days after he submitted the request.  In sum, there is a lack of evidence to demonstrate that Mills was the proximate cause of Plaintiff's failure to receive medical treatment until May 21, 2013.  Accordingly, whether LVN Mills did or did not report RN Dye's directive that Plaintiff complete the form for medical treatment, does not constitute deliberate indifference, as Mills followed protocol and it was not within Mills' duties or authority to determine if RN Dye properly evaluated Plaintiff's need for and timing of medical treatment.  Accordingly, summary judgment should be granted in favor of Defendant LVN Mills.

2.   Defendant RN Dye

Based on the allegations in Plaintiff's complaint, Plaintiff contends that RN Dye was aware of his need for medical care on two separate instances on May 18, 2013: (1) at 9:00 a.m. when Plaintiff claims that LVN Mills talked with RN Dye about his condition; and (2) on or about 10:00 a.m. when Plaintiff claims he told RN Dye through the clinic door that he was urinating blood.

With regard to the first incident on May 18, 2013, at 9:00 a.m., the undisputed facts demonstrate that when Plaintiff went to the C Facility Clinic at 9:00 a.m., he neither saw nor spoke with RN Dye.  (UF 57, 58.)  Although Plaintiff contends that LVN Mills went and spoke with RN Dye about his complaint, Plaintiff did not see Mills go and talk to RN Dye, has no idea whether Mills took the CDCR 7362 and showed it to RN Dye, and he did not hear any conversation between Mills and Dye.  (UF 59, 60, 61.)  Beyond Plaintiff's mere conclusory and speculative contentions, Plaintiff fails to set forth evidence that RN Dye knew anything about Plaintiff's complaints at 9:00 a.m. Furthermore, even assuming RN Dye heard from LVN Mills about Plaintiff's complaints and

17

1  instructed that he submit a CDCR 7362, such action does not demonstrate deliberate indifference.  (UF

2  62, 63.)

3        With regard to the second incident on May 18, 2013, at 10:00 a.m., when Plaintiff contends he

4  returned to the clinic and told RN Dye through the closed clinic door that he had blood in his urine,

5  Dye declares that she does not recall Plaintiff coming to the clinic with the specific allegations.  (Dye

6  Resp. to Interrog. No. 6.)  Dye further does not recall that Plaintiff reported to the clinic with any

7  medication condition requiring action under the emergency medical response system.  (Id.)

8  Consequently, policy and procedure required that Plaintiff, like all other inmates in C Facility, submit

9  a CDCR 7362 for his medical complaints in order to provide necessary information to assist in

10  assessment and triage.  (UF 62, 63, 64.)  The 7362 form would have been triaged by an RN within a

11  day, and processed accordingly.  (Dye Resp. to Interrog. No. 6; Barnett Decl. ¶ 18.)  There is no

12  second CDCR 7362 in Plaintiff's medical records and he has none in his possession.  (UF 8.)  In

13  addition, the only CDCR 7362 in Plaintiff's medical records makes no mention of blood in urine.  (UF

14  7.)

15        However, even assuming that Plaintiff verbally reported through the closed clinic door that he

16  had blood in his urine, Defendant Dye submits evidence, and it is undisputed, that such circumstance

17  would not necessarily constitute an emergency.  (UF 68.)  If Plaintiff had informed RN Dye of blood

18  in his urine, Dye would reasonably assess whether Plaintiff had an emergency that could not await the

19  ordinary procedure of visits following submission of a CDCR 7362.  (Barnett Decl. ¶ 25.)  Dr. Barnett

20  declares that Plaintiff's complaint of blood in his urine would not necessarily amount to a medical

21  emergency absent some indicia of his distress.  (Id. at ¶ 23.)  Dr. Barnes submits that there are many

22  benign non-emergent causes for a complaint of blood in urine: red tint without bleeding can be caused

23  by food substances, blood can appear in urine following extremely heavy exercising and local trauma

24  to the urethra can cause a spot of blood which looks worse when mixed with urine.  (Id.)  Kidney

25  stones passing can also cause blood in urine.  (Id.)  These conditions, particularly the passing of a

26  kidney stone, can also cause transient pain and vomiting that needs no immediate treatment.  (Id.)  Dr.

27  Barnes opines that the most common cause of blood in urine, a UTI, requires no immediate treatment

28  if mild.  (Id. at ¶ 24.)  Indeed, a UTI is not a medical emergency unless there are other medical

problems that reasonably require more immediate attention such as high fever, low blood pressure, elevated pulse, or other indicia of sepsis.  (Id.)  Plaintiff's medical records are devoid of any such problems and do not demonstrate the need for urgent treatment by RN Dye on May 18, 2013.  (Id. at ¶¶ 24, 25.)  In addition, Plaintiff's earlier complaints to LVN Mills that he was having difficulty retaining urine, experiencing some discomfort, and/or had vomited (assuming such complaints were made known to RN Dye), do not necessarily amount to a medical emergency absent some indicia of sepsis.  (Barnett Decl. ¶ 23.)  This is a medical care case, and Plaintiff may not offer as evidence his own opinion on matters which require scientific, technical, or other specialized knowledge, although he may attest to medical matters that do not fall within the scope of Rule 702.  Fed. R. Evid. 701, 702.  Thus, Plaintiff's statements in his declaration that LVN Mills is conspiring with RN Dye to cover up a Eighth Amendment violation," and "[t]he overall point is that Plaintiff medical problem was obvious but with such delay, all the time Plaintiff medical issue was manifesting towards a full blown urine tract infection (UTI) forcing Plaintiff to suffer needlessly[,]" are not admissible evidence.  (See Declaration of Plaintiff, at 4:27-28; 5:13-16, ECF No. 35.)  Defendants' objections to such statements are sustained. [6]

Plaintiff has not submitted any evidence to indicate that Defendant RN Dye deliberately ignored, delayed, or failed to respond to Plaintiff's medical needs.  Plaintiff fails to submit evidence that Defendant Dye intentionally ignored or failed to respond to Plaintiff's complaints and request for medical treatment.  Plaintiff's claim that RN Dye is "known to violate nursing protocol" and was "accused of neglect of duty," is not admissible evidence to demonstrate deliberate difference, and Defendants' objection to such contention is sustained.[7]  In addition, the declaration of inmate Tyrone

---

[6] Defendants object to Plaintiff's statements for lack of foundation and inadmissible medical opinions.  Fed. R. Evid. 602, 702.  Plaintiff's statements are not supported by any admissible evidence and Plaintiff lacks foundation.  Fed. R. Evid. 602.  In addition, Plaintiff makes expert medical and legal conclusion for which he is not qualified to provide.  Fed. R. Evid. 702.

[7] In support of his argument, Plaintiff cites to RN Dye's Responses to Requests for Admissions and argues that Dye admitted she was accused of neglect of duty.  (Declaration of Plaintiff, at 4:1-9, ECF No. 35.)  Defendants object to Plaintiff's statement as irrelevant, misstatement of the evidence, lack of authentication for failure to submit a complete document.  Fed. R. Evid. 402, 602, 901.  Defendants' objections are sustained, as RN Dye admitted that on one occasion, she was accused of "neglect of duty," for ordering a cocci serology laboratory test (for Valley Fever) of an inmate without

1   Thompson is not admissible evidence to support Plaintiff's argument that "RN Dye has a readiness to

2   lie and evade being held accountable for being deliberate [sic] indifferent to Plaintiff's serious medical

3   needs....", and Defendants objection to the declaration if sustained.[8]  (See Declaration of Plaintiff, at

4   4:21-23, ECF No. 35, Ex. F.)

5          There is simply no evidence that Defendant Dye knew of and disregarded an excessive risk to

6   Plaintiff's medical needs.  Indeed, Plaintiff acknowledges that in his interactions with RN Dye, she

7   was concerned about him, took care of him, and made sure he had what he needed.  (Jackson Dep. at

8   45:12-14.)  More importantly, Plaintiff's CDCR 7362 was triaged by RN Rojas, not RN Dye, within a

9   day of its submission.  (UF 66.)  Plaintiff has conceded that between the time he returned to his cell on

10  May 18, 2013, until May 21, 2013, when he was seen by RN Arola and in the TTA, he made no

11  mention to any custody officer that he needed medical care.  (Jackson Dep. at 34:17-24.)  Furthermore,

12  when Plaintiff attended his regular weekly physical therapy on May 20, 2013, he never mentioned to

13  the physical therapist that he was having any stomach pain, could not urinate, was vomiting, or wasn't

14  feeling well.  (Jackson Dep. at 36:3-16 and Ex. 5.)  There are no notes in the physical therapist's

15  record of any complaint of illness by Plaintiff.  (Jackson Dep., Ex. 5.)  At the most, Dye's failure to

16  ensure that Plaintiff saw a medical provider sooner would amount to negligence, which is insufficient

17  to establish deliberate indifference.  Thus, even if RN Dye should have done more on the information

18  available to her—which Plaintiff has not established—Dye's actions would then constitute only

19  negligence, which is insufficient to establish deliberate indifference to a serious medical need.  See

20  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1997); see also Wood v. Housewright, 900 F.2d

21  1332, 1334 (9th Cir. 1990) (an Eighth Amendment claim may not be premised on even gross

22  negligence by a physician.)  Accordingly, Defendant Dye is entitled to summary judgment.

23  ///

24

25  a physician's order.  The investigation, however, determined that the allegation was not sustained.  (Ex. N to Whitney
    Reply Decl., ECF No. 37-3.)

26

27  [8] Defendants object to the declaration of inmate Tyrone Thompson as not relevant, inadmissible medical expert opinion,
    and inadmissible character evidence.  Fed. R. Evid. 402, 404, 702.   Tyrone Thompson's declaration is not relevant to any
    claim by Plaintiff in this case, and the declaration contains inadmissible expert medical opinions concerning medical

28  causation for which inmate Thompson is not qualified to provide, and also contains inadmissible character evidence.  Id.

**IV.**

**CONCLUSION AND RECOMMENDATIONS**

In sum, the evidence shows that Defendants timely and appropriately responded to Plaintiff's medical needs and symptoms.  Contrary to Plaintiff's arguments that his complaints were ignored or unreasonably delayed, he was assessed within one day of his complaint by RN Rojas and was fully treated for his UTI within three days.  Plaintiff submits no evidence that Defendants impeded his diagnosis or resulting treatment.  Accordingly, Defendants are entitled to judgment as a matter of law on the claim that that they were deliberately indifferent to Plaintiff's serious medical needs.

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      Defendants' motion to strike Plaintiff's surreply be DENIED;

2.      Defendants' motion for summary judgment be GRANTED; and

3.      Summary judgment should be entered in favor of Defendants Mills and Dye.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **June 22, 2016**

_____
UNITED STATES MAGISTRATE JUDGE